# IN THE COURT OF APPEALS OF TENNESSEE, WESTERN SECTION
## AT JACKSON

_____

|  |  |  |
|---|---|---|
| **MYRTLE MAE DALY BROWN, et al**, | ) | Shelby County Chancer Court |
|  | ) | No. 97321-2 R.D. |
| Plaintiffs/Appellants. | ) | |
|  | ) | |
| VS. | ) | C.A. No. 02A01-9611-CH-00275 |
|  | ) | |
| **NORMA JEAN BELTON DALY**, | ) | |
|  | ) | |
| Defendant/Appellee. | ) | |
|  | ) | |

_____

From the Chancery Court of Shelby County at Memphis.
**Honorable John C. Robertson, Special Chancellor**

**FILED**

**September 4, 1997**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

**Carl I. Jacobson**,
**Gregory P. Aubuchon**,
WYATT, TARRANT & COMBS, Memphis, Tennessee
Attorney for Plaintiffs/Appellants.


**Joe M. Duncan**,
**R. Porter Feild,**
BURCH, PORTER & JOHNSON, Memphis, Tennessee
Attorney for Defendant/Appellee.

OPINION FILED:

**REVERSED AND REMANDED**


**FARMER, J.**

**CRAWFORD, P.J., W.S.**: (Concurs)
**TOMLIN, Sr. J.**: (Concurs)

This appeal concerns a suit for partition and sale of real property. In June 1989, Myrtle Mae Daly Brown, Willie Myrle Daly Cruse, Mary Elizabeth Daly Wolfe and T. J. Ward filed suit against Norma Jean Belton Daly, Appellee, claiming that they each own an undivided one-fifth interest in property, identified as 700 Reed Hooker Road, as the children and surviving heirs of Earl J. Daly (hereinafter "Father") who died on August 7, 1966.[1] They further asserted that Appellee is the rightful owner of the remaining one-fifth interest as the widow and will beneficiary of Earl W. Daly (hereinafter "Son"), their brother, who died in August 1988. Appellee filed a counter-claim contending that Son solely owned the property at the time of his death and that as the land passed to her under the terms of his will, she is the lawful owner in fee simple. Appellee asserted that Son acquired the entire property either by prescription or by transfer of equitable title from Father to Son based on a contract to purchase. Appellee also relied upon the defense of laches.

This matter has come before this Court once before. After suit was filed, Appellants demanded a jury trial in conformity with Rule 38.02 T.R.C.P. The chancery court denied their demand on the ground that they had failed to comply with a local rule of court. The case proceeded to trial without a jury and at the close of Appellants' proof, the court granted Appellee's motion to dismiss. On appeal, this Court reversed, holding that the chancellor had erred and that Appellants were entitled to a trial by jury. *See Brown v. Daly*, 884 S.W.2d 121 (Tenn. App. 1994). Upon remand, the trial court entered judgment on a jury verdict finding that all right, title and interest in the property was vested in the appellee and dismissed Appellants' complaint. It is from this decision that Appellants now appeal, citing error in certain evidentiary rulings of the trial court. For the reasons hereinafter expressed, we reverse and remand for a new trial.

The proof establishes that in June 1964, Father purchased 29.09 acres at 700 Reed Hooker Road for approximately $6,500. The deed to the property has remained in Father's name since purchase. Shortly after purchase, a five room house was transported to the property. It is disputed as to whether the home was actually purchased by Father or Son. When Father died

---

[1] The record indicates that a substitution of parties occurred as to Mr. Ward who died after this lawsuit was filed. The record further reflects the death of the substituted party, Beatrice Darnell Ward. Joyce Benham, Gene Posey, Marty Ward and Joann Thompson were thereafter substituted as party plaintiffs. They, along with Mrs. Brown, Crews and Wolfe are the appellants in this case.

intestate, he was survived by Son, T. J. Ward and Mrs. Brown, Wolfe and Crews. Son married the appellee in September 1969 after divorcing his first wife. No children were born of either marriage. Son devised the entire property to Appellee under the terms of his will. Considerable improvements were made to the home and property throughout the years. Contradictory evidence was presented as to whether Father actually made any improvements to or even lived on the property prior to his death. There was testimony that only Son lived on the property until his marriage to Appellee. It is not disputed that Son and Appellee resided in the home, making various improvements thereon, until Son's death and that Appellee continues to reside there.

The crux of this appeal pertains to the trial court's exclusion of certain evidence proffered by Appellants that Son continued to live on the premises after Father's death only with the express permission of his siblings. The evidence sought to be introduced pertained to a meeting Appellants assert took place at the property shortly after Father's death between Son and his three sisters at which time the latter made statements granting Son permission, at his request, to continue living there. The chancellor excluded the statements as inadmissible hearsay. Appellants made an offer of proof based on the testimonies of Mrs. Brown and Mrs. Wolfe. Mrs. Brown stated:

> Q. At that meeting, did you give permission to your brother to stay at 700 Reed Hooker Road?
>
> A. Yes, I did.
>
> . . . .
>
> Q. Tell the Court about that discussion.
>
> A. After we had taken care of what was going to happen with the personal property, the question of the farm arose, and my brother, said that he would like to live there. I don't know exactly what the words were, and we said, okay, all right, whatever.
>
> . . . .
>
> Q. Did you believe you had the right to refuse him permission?
>
> A. Yes, I do.

Mrs. Wolfe's offer of proof is in accord. However, she was additionally questioned as follows:

Q. Did you believe [you] were giving up your ownership interest in that property when you [gave your permission]?

A. No.

Though the trial court refused to admit this testimony, it allowed evidence as to any statements made by Son at the meeting which constituted admissions against interest. Accordingly, the jury was privy to the following testimony:

Q. Mrs. Brown, did your brother talk about this real property?

A. Yes, he did.

Q. And what did he tell you?

A. That he would like to stay out there, and just stay there because that's where he was at the present time.

. . . .

Q. Had he been living there with your father?

A. Yes . . . .

. . . .

Q. When you went to that meeting, did you believe that you had ownership interest in this property?

A. Yes, I did.

Q. And did you believe your sisters had ownership interest in this property?

A. Yes, I did.

Q. And did you believe your brother had ownership interest in the property?

A. Yes, he did.

. . . .

Q. Did your brother say anything to make you think any differently at that meeting about who owned the property?

A. No, he did not.

Mrs. Crews testified:

Q. After your father died, was there a meeting out at Reed

Hooker Road?

A. . . . . yes.

. . . .

Q. What did your brother tell you about the real property?

A. He says I live here. I'll go ahead and stay if it's okay.

Q. So he specifically asked you if it was okay for him to stay there?

A. Yes.

Q. And after that meeting he, in fact, stayed at the property for the rest of his life?

A. Yes.

. . . .

Q. During the next 22 years, was anything said to you by anybody that made you believe that you lost your interest in that property?

A. No.

. . . .

Q. You've talked about what your brother said about the property when you had this meeting . . . after your dad died. Did your brother talk to you about this property anytime after that meeting?

A. Yes, he did.

Q. And when was that?

A. About six months before he died.

. . . .

Q. What did your brother tell you about the ownership of the property?

A. He said that [Father] owned the property. Nobody else was entitled to it.[2]

Appellants first issue is "[w]hether the trial court erred in excluding [Appellants'] testimony regarding their grant of permission to [Son] to remain on the subject property, with such exclusion thereby denying [Appellants] the opportunity to rebut [Appellee's] presumption of title by prescription." Appellants argue that by allowing Appellee to set forth facts that tend to prove the

---

[2]The testimony of Mrs. Wolfe is in accord.

elements of prescription, she raised a rebuttable presumption that Son obtained exclusive title to the property and that their only way to rebut the presumption is to present testimony establishing that Son's actions were with permission, thereby rendering the doctrine inapplicable. They assert: "the law of prescription ascribes to statements that grant permission a legal significance quite apart from the truth of the matter asserted."

*Morgan v. Dillard*, 456 S.W.2d 359 (Tenn. App. 1970), holds that a presumption of title may arise by an exclusive and uninterrupted possession of the land by one tenant in common for twenty or more years, claiming the same as his own, without any recognition of his co-tenants or claim upon their part. The presumption, however, may be rebutted by facts showing that the possession was not adverse but by the indulgence, permission, or as tenant of the owner. *Morgan*, 456 S.W.2d at 363. Accordingly, the elements necessary to establish title by prescription are:

> (1) The prescriptive holder has been in exclusive and uninterrupted possession of the land in question for more than 20 years, claiming the same as his own without any accounting to his co-tenants or claim on their part -- they being under no disability to assert their rights.

> (2) The holder's occupancy of the property in question was without the actual or implied permission of the other co-tenants.

*Livesay v. Keaton*, 611 S.W.2d 581, 583 (Tenn. App. 1980). If either of these elements is not proven, the doctrine of title by prescription does not apply. *Livesay*, 611 S.W.2d at 584.

It is not disputed that Son made no formal accounting to his siblings regarding the property. Further, Appellants do not claim a disability to assert their rights. The only element in issue, therefore, concerns whether Son's continued use and possession of the property for some 22 years was permissive. The jury answered the following factual questions in the affirmative:

> **Question No. 1**: Did the Plaintiffs prove by a preponderance of the evidence that Earl Daly (father) owned 700 Reed Hooker Road when he died on August 7, 1966?

> **Question No. 2**: Did the Defendant prove by a preponderance of the evidence that: (1) Earl Wesley Daly (son) was in exclusive and uninterrupted possession of 700 Reed Hooker Road for a period of

more than 20 years ---- claiming the same as his own, without any account with this co-tenants or claim on their part ---- they being under no disability to assert their rights; and (2) such possession as without the permission of Plaintiffs?

. . . .

**Question No. 4**: Do you find that the Plaintiffs waited too long to raise their claims, so that the passage of time resulted in the loss of evidence, the death of witnesses or parties, and a failure of memory which obscured the facts to the prejudice of the Defendant so as to make it impossible to find the truth?

We are inclined to agree with Appellants that their proffered statements granting permission to Son to remain on the property after Father's death constitute non-hearsay operative facts and not inadmissible hearsay as suggested by Appellee. Section 801.5 of *Tennessee Law of Evidence* provides:

> One of the more difficult, though infrequently encountered, categories of nonhearsay evidence encompasses operative facts, sometimes referred to as verbal acts. Operative facts are words that operate to cause legal consequences wholly apart from the truth or falsity of the words. Substantive law may make the utterance of words an event that causes a change in legal relationships, irrespective of the truth or falsity of the words or the credibility of the speaker.

Neal P. Cohen, et al, *Tennessee Law of Evidence*, § 801.5 at 497 (3rd ed. 1995). In *Collins v. Greene County Bank*, 916 S.W.2d 941 (Tenn. App. 1995), the court held that a statement made by a representative of defendant bank to one of its customers that plaintiff (his business associate) was "stealing [him] blind" to explain bank's refusal to make a loan was "not necessarily inadmissible" but "could be nonhearsay operative facts which are admissible." *Collins*, 916 S.W.2d at 947. The customer thereafter refused to assist plaintiff in taking out a loan and plaintiff filed suit against bank alleging, *inter alia*, a tortious interference with a business relationship. *Id*. at 944-46. Bank relied upon the doctrine of justification as a defense. *Id*. at 947. *Collins* analogized the situation to a defamation action where it is necessary for the plaintiff to prove that the defendant spoke or wrote the defamatory words. The plaintiff's purpose is not to prove the statement true. *Id*. at 948.

Two other examples are set forth in *Tennessee Law of Evidence*. The first involves contract law, where the issue is whether a contract was formed and the witness testifies that the

declarant offeree was heard to say "I accept." The second relates to the law of gifts where the object must be delivered with the requisite intent and there is testimony that the item is transferred and the words "I give you this" are spoken. In both instances, it is found that the mere uttering of the words have legal significance.

Similarly, we hold that where a co-tenant is claiming title by prescription (which necessarily entails proof that his possession of the land was without the other co-tenants' permission), statements made by the other co-tenant(s) granting him permission to remain on the property are not inadmissible hearsay but have legal significance and effectuate legal consequences, in and of themselves, irrespective of their truth or falsity. We further find that the exclusion of this testimony prejudiced the appellants in their ability to refute the defense of laches set forth by Appellee. The jury's finding that the appellants waited too long to pursue their claims supports a finding of laches. However, under § 801.7, *Tennessee Law of Evidence*, it is stated: "[a]nother category of nonhearsay is a declaration to prove the speaker['s] . . . mental state, . . . This section, . . . considers only those utterances offered for the ***underlying implied*** assertion that is circumstantially implicit in the literal spoken . . . words. This use is often viewed as nonhearsay." If indeed the appellants gave their permission for Son to remain on the property such would explain their inaction in asserting their property rights for some 22 years. Granted, Appellants were allowed to testify that they only became aware that someone was questioning their ownership interest after Son's death and that until such time they had no reason to believe they no longer had an interest in the property. We find such limited testimony, however, insufficient on the issue and hold that the jury should have been allowed to consider the excluded evidence as a just reason for the appellants' inaction. Based on the foregoing, we conclude that the exclusion of this evidence was not harmless.

The appellants' final issue is "[w]hether the trial court erred in admitting into evidence [Son's] check to [Father], as such check contained hearsay evidence regarding an alleged agreement between them for transfer of title to the subject property." Appellants refer to a check dated May 19, 1966 drawn on the account of Son payable to Father in the amount of $1,521.49. The "for" line at the bottom of the check states: "Payment in full for all interest in 29.1 acres at 700 Reed Hooker Road." Appellants assert that the "for" line of the check constitutes inadmissible hearsay. The jury answered "yes" to the following question: "[d]o you find that the check dated May 19, 1966

from [Son] to [Father] was tendered in full payment for all of the father's interest in 700 Reed Hooker Road?"[3] In *Brown v. Daly* this Court previously determined that the chancellor's finding that the check "constituted a valid transfer and expressed intent, of both the father and the son, . . . that the son have all title and interest in the said property" was error and held: "[w]hile the check may be a sufficient memorandum to satisfy the Statute of Frauds, in and of itself, the check does not, in our opinion, rise to the dignity of an instrument of conveyance or transfer of title in and to the subject property." *Brown*, 884 S.W.2d at 125.

We hold this Court's prior opinion law of the case on this issue. *See Ladd v. Honda Motor Co.*, 939 S.W.2d 83, 90-92 (Tenn. App. 1996). Although *Brown* finds only that the document "may be" sufficient to satisfy the statute of frauds, the court, nonetheless, holds that the check does not represent an instrument of conveyance or transfer of title. The trial court is instructed on remand to disallow the admission of this evidence for the purpose of establishing such.

It results that the judgment of the trial court is reversed and this cause remanded to the trial court for a new trial consistent with the holdings in this opinion. Costs are assessed against the appellee, for which execution may issue if necessary.

_____
FARMER, J.

_____
CRAWFORD, P.J., W.S. (Concurs)

_____
TOMLIN, Sr. J. (Concurs)

---

[3]This Court acknowledges the inconsistency in the findings made by the jury. In light of our decision, it is unnecessary to address this matter.