IN THE COURT OF APPEALS

AT KNOXVILLE

| | |
|---|---|
| DEBORAH H. STEELE,<br><br>    Plaintiff-Appellee,<br><br><br>v.<br><br><br><br><br>SUPERIOR HOME HEALTH CARE OF<br>CHATTANOOGA, INC., and<br>DAVID TWOMBLEY, individually,<br><br>    Defendants-Appellants. | ) C/A NO. 03A01-9709-CH-00395<br>)<br>)<br>)<br>)<br>)<br>) APPEAL AS OF RIGHT FROM THE<br>) HAMILTON COUNTY CHANCERY COURT<br>)<br>)<br>)<br>)<br>)<br>)<br>) HONORABLE R. VANN OWENS,<br>) CHANCELLOR |

**FILED**

Nov. 10, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

For Appellant Superior Home
Health Care of Chattanooga, Inc.

J. SCOTT McDEARMAN
TONYA K. CAMMON
Grant, Konvalinka &
  Harrison, P.C.
Chattanooga, Tennessee


For Appellant David Twombley

JOHN C. HARRISON
CYNTHIA R. FREEMON
Baker, Donelson, Bearman &
  Caldwell
Chattanooga, Tennessee

For Appellee

GRACE E. DANIELL
Starr & Daniell, P.C.
Chattanooga, Tennessee


O P I N I O N


AFFIRMED AND REMANDED                                    Susano, J.

The plaintiff, Deborah H. Steele ("Steele"), brought this action against her former employer, Superior Home Health Care of Chattanooga, Inc. ("Superior"), and her former supervisor, David Twombley ("Twombley")[1], alleging that she was the victim of, among other things, sexual harassment, outrageous conduct, and the intentional infliction of emotional distress. After various other claims were dismissed by the trial court[2], the case proceeded to trial before a jury on Steele's claim of sexual harassment against both Superior and Twombley under the Tennessee Human Rights Act, T.C.A. § 4-21-101, *et seq*. ("THRA"), and her claim of outrageous conduct and intentional infliction of emotional distress, against Twombley alone. The jury found in favor of Steele on all of the remaining theories of recovery and awarded her $1.2 million in compensatory damages and $60,000 in punitive damages. The trial court also awarded Steele attorney's fees and costs against both defendants. After Steele accepted a remittitur that eliminated the punitive damages award and reduced the compensatory damages award to $850,000, both Superior and Twombley appealed, raising in substance the following issues for our consideration:

> 1. Did the trial court err in allowing inadmissible hearsay testimony from witnesses who did not have first-hand knowledge of the events in question?

---

[1] Steele also sued Alpha Medical, Inc.; however, she subsequently took a voluntary nonsuit as to that entity.

[2] The trial court granted summary judgment in favor of Superior on Steele's claims of outrageous conduct, intentional infliction of emotional distress, and negligent hiring and retention of employees. The court also directed a verdict in favor of Superior on Steele's retaliatory discharge claim. The plaintiff does not raise any issues as to these actions of the trial court.

2. Did Steele's counsel make improper and prejudicial statements during closing argument, thus warranting a new trial?

3. Is there material evidence in the record to support the jury's verdict?

4. Did the trial court err in submitting to the jury Steele's cause of action against Twombley under the THRA?

5. Did the trial court err in giving the jury an inaccurate charge, thereby prejudicing its verdict against Twombley?

6. Did the trial court err in not suggesting a further remittitur of the jury's verdict?

7. Did the trial court err in awarding attorney's fees against Twombley under the THRA?

I.

Steele, a psychiatric nurse, was hired by Superior in late 1991. She was originally supervised by Linda Nation. Shortly thereafter, she also came under the administrative supervision of Twombley, who had been hired by Superior to develop new programs, including the psychiatric program to which Steele was assigned.

Steele testified that she began having problems with Twombley shortly after coming under his supervision. She stated that when she first saw Twombley, he told her that he knew she had a reputation for having been involved with a male patient -- a charge that Steele denied. She also testified that, on a trip to Athens, Tennessee, Twombley became upset with her when she expressed concerns about the amount of time she was on call, and told her that if she quit she would "never work anywhere else in

this town again." Steele also stated that, while returning to Chattanooga on the same trip, Twombley made an extremely offensive remark, using vulgar terms regarding how much he liked sex. The next day, Steele told one of her clinical supervisors, Cindy Ewton, about Twombley's remarks, and a meeting was eventually arranged among Steele, her two clinical supervisors (Ewton and Nation), and Mary Hogg, Superior's Executive Director of Nursing. Steele testified that she complained to Hogg about Twombley's behavior, but that no corrective action was taken as a result of the meeting. Hogg testified that she met with Twombley, who denied making any inappropriate statements, and informed him that such behavior would not be tolerated.

Over the course of the next year, according to Steele, Twombley continued to behave inappropriately toward her in the workplace. Specifically, she testified that he would, among other things, stand too close to her; kneel at her desk and touch her knee to "steady himself"; attempt to engage her in sexual conversations; ask if she had tried various sexual acts; make comments such as, "I bet your boyfriend has a lot of fun in bed with you"; talk about sexual incidents involving his former patients; and make various demeaning comments to her, such as calling her "stupid" or "dumb." Steele also testified that on one occasion, Twombley showed her a performance evaluation in his office, turned off the overhead light, and gave her a rose. She stated that he would frequently ask her to go hiking, or to go out for coffee or dinner, and that he would get angry when she declined his invitations. Steele testified that on one occasion after she had told Twombley that the only relationship she wanted

4

with him was a professional one, he said, "no, I want a commitment from you."

Steele testified that she continued to complain about Twombley's actions to her immediate clinical supervisors, Ewton and Nation. She testified that despite her complaints, nothing was done to stop Twombley's behavior, which became progressively more offensive. According to Steele, Twombley continued to make statements such as, "I'll show you what a real man is all about," as well as more offensive comments to the effect that they would not have any problems between them if she would give in to his advances. Steele further testified that on more than one occasion, he made references to his desire to engage in oral sex with her. Steele also described an incident in which Twombley told her he had written a letter requesting a raise for her and then said, "[y]ou could be a lot of fun to work with. I'm a lot of fun to work with... a woman like [you] would like a little gentle pain."

Steele maintained that, on more than one occasion, she investigated the possibility of transferring to other positions. She stated that she was twice told that she was too valuable to the psychiatric program, and that on another occasion, she was simply told that she could not have an available supervisory position.

Steele also testified that Twombley continued to behave inappropriately on work-related trips. She stated that on one such occasion, Twombley indicated that he was aroused and

5

attempted to place her hand on him. According to Steele, Twombley's harassment on these trips culminated in an April, 1993, trip back from the Dayton, Tennessee office, when Twombley drove to an isolated area in a park, forcibly pulled Steele out of the car, and violently raped her. Steele testified that following the rape she did not see a doctor or go to the police; in fact, she explained that she essentially "blocked out" the incident and did not come to terms with what had happened until approximately three years later, after she had undergone extensive therapy. This testimony was substantiated by Dr. David Solovey, Steele's psychologist, who testified that her memory of the rape had been suppressed until it was brought to the surface in the course of her therapy.

Subsequent to the events of April, 1993, Steele continued to work under Twombley's supervision. She testified that the harassment continued, and that she ultimately arranged another meeting with Mary Hogg in August, 1993. At that time, Hogg met with Steele and several other nurses to discuss Twombley's behavior. Twombley resigned on August 16, 1993. He originally gave two weeks' notice. After meeting with Steele and the other nurses, however, Hogg suggested that Twombley leave immediately, and he complied.

Steele continued working at Superior until December, 1993, at which time the psychiatric program was terminated.

In support of her claims, Steele introduced the testimony of various supervisory and nursing personnel who had

6

worked for Superior.  Among other things, these witnesses related their observations regarding Twombley's behavior toward Steele, as well as Steele's complaints regarding that behavior.  For example, Janet Weise, who also worked as a nurse in the psychiatric program, testified that Twombley had made sexual comments and innuendos regarding Steele to her.  She also stated that, around the time of Twombley's resignation, she had met with Hogg and reported some of Twombley's comments because she was concerned about the stress he was placing on Steele.  Linda Nation, one of Steele's clinical supervisors, testified that Twombley had made derogatory remarks to her about Steele's reputation.  She also testified that Steele had continually complained about Twombley's behavior.  Wanda Martin, a physical therapy assistant, testified that she had observed Twombley hovering over Steele and kneeling at her desk, and that she had noticed that this made Steele uncomfortable.  Virginia Mastin, another nurse in the psychiatric program, described similar incidents, and also recalled Twombley asking what size underwear Steele wore.  She testified that she also met with Hogg to express her concern over Twombley's behavior toward Steele. Martin further testified that although James Callaway, Superior's Executive Director and Hogg's immediate supervisor, had been made aware of Steele's complaints, he did nothing in response. Another witness, Cindy Ewton -- one of Steele's clinical supervisors -- testified that Steele complained repeatedly about Twombley, and that she had reported all of Steele's complaints in her chain of command to her own supervisor, Darlene Bellows.

In defense of Steele's claims, Superior offered the testimony of Darlene Bellows and Kathleen Grimes, each of whom had supervised Steele for a short time. Both Bellows and Grimes testified that they had never witnessed Twombley behave inappropriately. Mary Hogg testified to the same effect. Hogg also stated that, following her initial meeting with Steele, the latter did not complain to her again until August of 1993. Finally, James Callaway testified that no one, including Steele, had ever complained to him regarding Twombley. Twombley, for his part, denied Steele's allegations.

The jury determined that the defendants were liable to Steele on the theories of hostile environment and quid pro quo sexual harassment. It additionally found that Twombley was liable to Steele for his outrageous conduct and intentional infliction of emotional distress.[3] The jury thus awarded Steele $1.2 million in compensatory damages, and $60,000 in punitive damages. The trial court suggested a remittitur of the full amount of punitive damages and $350,000 of the compensatory damages, thereby reducing the verdict to $850,000 -- the amount sued for in the complaint. It then denied the defendants' motions for a new trial, contingent upon Steele's acceptance of the remittitur. Steele accepted the remittitur without protest. Both defendants appealed.

II.

---

[3]The jury responded to specific interrogatories.

Steele's sexual harassment claims were brought pursuant to the provisions of the THRA, T.C.A. § 4-21-101, *et seq*. The THRA provides, in pertinent part, as follows:

## § 4-21-401(a)

It is a discriminatory practice for an employer to:

(1) Fail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin;...

## § 4-21-301

It is a discriminatory practice for a person or for two (2) or more persons to:

*     *     *

(2) Aid, abet, incite, compel or command a person to engage in any of the acts or practices declared discriminatory by this chapter;...

A "person" is defined by the THRA to include a corporation. *See* T.C.A. § 4-21-102(14).

### III.

We turn first to the admission-of-evidence issue raised by Superior. It contends that the trial court erred in allowing a number of witnesses to testify regarding Twombley's alleged harassment when they did not have firsthand knowledge of his conduct. Specifically, Superior insists that the testimony of four witnesses -- Linda Nation, Wanda Martin, Willadean Carrol,

9

and Virginia Mastin -- was based only on what those witnesses had been told by Steele, and was, therefore, improperly admitted.

With regard to Nation's testimony, we note that she was one of Steele's clinical supervisors. Thus, Steele's comments to her regarding Twombley's behavior were admissible to prove that Superior had *notice* of the alleged harassment, rather than for the purpose of proving the truth of her assertions. These complaints had "legal significance and effectuate[d] legal consequences, in and of themselves, irrespective or their truth or falsity," and, as such, were not hearsay. *See **Brown v. Daly***, 968 S.W.2d 814, 818 (Tenn.App. 1997).

The other witnesses whose testimony Superior challenges were not supervisory personnel. However, Martin and Mastin both testified that they had observed Twombley standing close to Steele, kneeling at her desk, and obviously making her uncomfortable. Martin testified that she had on one occasion called Steele and asked if she needed to get away from Twombley, who was then at Steele's desk; Steele responded affirmatively and pretended that she was speaking to a patient so that Twombley would leave her alone. Virginia Mastin testified that she had heard Twombley make several inappropriate comments of a sexual nature regarding Steele and others. Mastin stated that she became concerned for Steele's safety and arranged a meeting with Hogg. Given the nature of this testimony, these witnesses did not lack firsthand knowledge of Twombley's behavior. We acknowledge that the testimony of the fourth witness, Carrol, a co-worker, was essentially based on statements made to her by

10

Steele.  However, Carrol testified very briefly on this subject and added little, if anything, to the record as a whole.  We do not find, considering the entire record, that the admission of Carrol's testimony "more probably than not affected the judgment."  Rule 36(b), T.R.A.P.  Accordingly, any error in admitting Carrol's testimony, or any similar testimony by co-workers Martin and Mastin regarding Steele's complaints to them, was harmless.  *Id.*  We find Superior's first issue to be without merit.

IV.

Superior and Twombley both argue that Steele's attorney made prejudicial statements during closing argument, thereby warranting a new trial.  Specifically, they contend that Steele's attorney made an improper "Golden Rule" argument[4] by making the following statement to the jury:

> Ask yourself, if this had happened to your
> close friend, if this had happened to your
> sister, your daughter, how would you value
> it?

In its charge to the jury, the trial court issued the following curative instruction:

> ...it would be improper for you to award --
> what you would take as damages for the wrongs
> allegedly suffered by the plaintiff here are
> really perhaps -- in argument, someone may
> have talked about if it had been your mother
> or someone in your family what would be the

---

[4]*See* **Perkins v. Sadler**, 826 S.W.2d 439, 442-43 (Tenn.App. 1991).

11

> reasonable compensation.  That's not the law.
> You need to apply the law and do your job as
> jurors to give your best assessment and not
> substitute yourself or any one person in the
> place of the plaintiff, but use your best
> judgment and then establish an amount of
> damages that's fair and reasonable in light
> of the evidence before you.

It is well-established that the trial court is vested with sound discretion in exercising control over what will or will not be permitted in argument.  *See, e.g., **Perkins v. Sadler***, 826 S.W.2d 439, 442 (Tenn.App. 1991).  It has also been stated that

> [g]enerally the appellate courts will not
> interfere with the discretionary action of
> the trial court in refusing a mistrial or a
> new trial for misconduct of counsel in
> argument unless the argument is clearly
> unwarranted and made purely for the purpose
> of appealing to passion, prejudice and
> sentiment which has not or cannot be removed
> by sustaining objection of opposing counsel,
> or unless the appellate court finds
> affirmatively that it affected the result of
> the trial. [Citations omitted.]

*Id.* (quoting ***J. Avery Bryan, Inc. v. Hubbard***, 225 S.W.2d 282, 287 (Tenn.App. 1949)).

We agree with the defendants that counsel's statement was improper.  However, we believe that the trial court's curative instruction was sufficient to blunt the risk of any prejudicial effect upon the jury's verdict.  We certainly cannot say that counsel's improper argument affected the jury's verdict in this case.  ***Perkins***, 826 S.W.2d at 442.

12

V.


We next turn to the defendants' contentions that the jury's verdict was contrary to the evidence and resulted from passion, prejudice or caprice.  In this connection, Superior argues that Steele failed to establish certain elements of her hostile environment and quid pro quo sexual harassment claims under the THRA.  Twombley, meanwhile, insists that he cannot be held individually liable under the THRA.  Both challenge the amount of damages.


A.


In reviewing a jury's verdict, we must decide if the record contains "material evidence to support the verdict."  Rule 13(d), T.R.A.P.; *Coffey v. Fayette Tubular Products,* 929 S.W.2d 326, 331 n.2 (Tenn. 1996); *Pettus v. Hurst*, 882 S.W.2d 783, 788 (Tenn.App. 1993); *Benson v. Tennessee Valley Elec. Coop.*, 868 S.W.2d 630, 640 (Tenn.App. 1993).  In this case, the trial judge approved the jury's verdict, as remitted.  Thus, it is clear that

> ...the trial judge's approval of the amount of the jury's verdict invokes the material evidence rule, just as it does with respect to all other factual issues upon which appellate review is sought, and that "[a]ll of the evidence in the record that tends to support the amount of the verdict should be given full faith and credit upon appellate review."

*Poole v. Kroger Co.*, 604 S.W.2d 52, 54 (Tenn. 1980)(citing *Ellis v. White Freightliner Corp.*, 603 S.W.2d 125 (Tenn. 1980)). We are required to take the strongest legitimate view of all the evidence, including all reasonable inferences therefrom, to sustain the verdict; to assume the truth of all the evidence that supports it; and to discard all evidence to the contrary. *Poole*, 604 S.W.2d at 54. In this analysis, we do not weigh the evidence, nor do we determine the credibility of the witnesses. *Id.*; *Grissom v. Metropolitan Gov't of Nashville*, 817 S.W.2d 679, 684 (Tenn.App. 1991). On the contrary, "[r]econciling apparently conflicting testimony and evaluating the witnesses' credibility are, in the first instance, the jury's responsibilities." *Id.* at 683. Furthermore, as noted in *Grissom*,

> [s]exual harassment cases, by their very
> nature, require the finders of fact to
> reconcile conflicting testimony by evaluating
> the witnesses' credibility.

*Id.* at 684.

B.

We turn now to the question of whether the evidence satisfied each element of Steele's hostile environment harassment claim. Generally speaking, a hostile work environment is created "where conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 31 (Tenn.

14

1996)(quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).  The basic elements of a supervisor-created, hostile work environment sexual harassment claim under the THRA are:

> (1) the employee was a member of a protected class;
>
> (2) the employee was subjected to unwelcomed sexual harassment;
>
> (3) the harassment occurred because of the employee's gender; [and]
>
> (4) the harassment affected a "term, condition or privilege" of employment....

*Carr v. United Parcel Service*, 955 S.W.2d 832, 836 (Tenn. 1997). In addition, the Supreme Court held in *Carr* that employer liability also depends on: "(1) whether the supervisor's harassing actions were foreseeable or fell within the scope of employment; and (2) even if they were, whether the employer responded adequately and effectively to negate liability."[5] *Id.* at 838; *Sanders v. Lanier*, 968 S.W.2d 787, 789 n.4 (Tenn. 1998). Thus, the Court held, "the employer's liability is predicated on its reaction to the discriminatory conduct." *Carr*, 955 S.W.2d at 838.[6]

---

[5]In so holding, the Court in effect drew a distinction between hostile environment claims based upon *supervisor* harassment, and those arising from *co-worker* harassment.  In enumerating the elements of the latter type of claim, the Court noted that, in addition to the four elements listed above, the plaintiff must prove that "the employer *knew or should have known* of the harassment and failed to respond with prompt and appropriate corrective action."  *Carr*, 955 S.W.2d at 836 (emphasis added)(citing *Spicer v. Bearman Bottling Co.*, 937 S.W.2d 884, 888 (Tenn. 1996)).

[6]We are aware of the United States Supreme Court's recent decisions in *Burlington Industries, Inc. v. Ellerth*, ___ U.S. ___, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) and *Faragher v. City of Boca Raton*, ___ U.S. ___, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).  In those cases, the Supreme Court held that

Neither defendant argues that there is no material evidence to establish the first four elements of a hostile environment harassment claim. Even if they had, our review of the record, and particularly the testimony of Steele and the witnesses called to testify on her behalf, persuades us that there is material evidence that Twombley sexually harassed Steele. Superior does contend, however, that Steele failed to establish the basis for *employer* liability in that she failed to prove the last two elements stated in **Carr**. Specifically, Superior argues that Twombley's actions were not foreseeable, and that it responded adequately and effectively so as to negate liability. However, Superior acknowledges -- and we agree -- that Twombley's actions "allegedly occurred during work hours and in a work setting," *i.e.*, within the scope of employment. We

---

> [a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ. Proc. 8(c). The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

**Burlington Industries,** 118 S.Ct at 2270; **Faragher**, 118 S.Ct. at 2292-93. In these decisions, the Supreme Court proceeded through a detailed analysis of the circumstances under which an employer's conduct may lead to liability in hostile environment cases. It is true that **Burlington** and **Faragher** set forth the two above-quoted elements as an affirmative defense that may be established by the employer; **Carr**, on the other hand, focuses on whether the supervisor's actions were foreseeable or fell within the scope of employment, as well as on the sufficiency of the employer's response. **Carr**, 955 S.W.2d at 838. However, we do not believe that the expanded analysis of **Burlington** and **Faragher** impacts our review of the instant case under the **Carr** decision. Our Supreme Court has yet to address the impact of **Burlington** and **Faragher**; we therefore proceed under the framework set forth in **Carr.**

find and hold that there is material evidence that Twombley's "harassing actions were foreseeable or fell within the scope of employment." *Carr*, 955 S.W.2d at 838. Accordingly, there is material evidence establishing the first prong of *Carr's* test of employer liability for hostile work environment harassment. *Id*.

As to the final criterion for imposing liability upon an employer, Superior points to the following facts as evidence that it responded "adequately and effectively" to the alleged harassment: Hogg's investigation and verbal warning to Twombley following her initial meeting with Steele; Steele's failure to complain again to Hogg until approximately 18 months later; and Superior's request, following Steele's "second complaint of sexual harassment," that Twombley leave his job immediately.

Our Supreme Court has stated that determinations regarding the appropriateness of an employer's response depend upon the circumstances of each case. *Campbell*, 919 S.W.2d at 33. In this instance, the record contains material evidence that Superior failed to respond "adequately and effectively" to Steele's complaints. Taking the strongest legitimate view of all the evidence to sustain the verdict, *Poole*, 604 S.W.2d at 54, it is clear that Steele complained to Hogg following her trip to Athens; that despite Hogg's "warning" to Twombley, his harassment of Steele continued; that Steele's supervisors, Nation and Ewton, had knowledge of the harassment; and that not enough was done to curb Twombley's behavior during his employment at Superior. There is material evidence in the record to indicate that, by the time Hogg told Twombley to leave Superior immediately, he had

17

harassed Steele for approximately a year and a half and had raped her in April, 1993.

Accordingly, we hold that the record contains material evidence to support the jury's finding that Superior is liable for the hostile environment created by Twombley's harassment of Steele.[7]  *See* Rule 13(d), T.R.A.P.

We next address the question of whether Twombley may be individually liable under the THRA on a theory of hostile work environment sexual harassment.  As noted earlier, the THRA prohibits an *employer* from engaging in discriminatory practices against a person based on sex.  T.C.A. § 4-21-401.  The THRA's definition of "employer" includes "any person acting as an agent of an employer, directly or indirectly."  T.C.A. § 4-21-102(4).  However, the Supreme Court expressly held in **Carr** that "the THRA's 'agent of an employer' language does not impose individual liability."  **Carr**, 955 S.W.2d at 835.  The Court did opine that an individual, under the proper circumstances, could be liable under the THRA's prohibition against aiding or abetting others who engage in discriminatory acts.  **Id.** at 836; *see* T.C.A. § 4-21-301(2).

Twombley asserts that the record does not support a finding that he violated the "aiding and abetting" provision of T.C.A. § 4-21-301(2). The **Carr** decision, however, states that "[a] supervisor ... may be individually liable for encouraging or

---

[7] In view of our resolution of this issue in Steele's favor, we do not find it necessary to reach her separate issue that Superior failed to preserve the question of the adequacy of the proof in its motion for a new trial.

18

preventing the employer from taking corrective action." *Id.* at 838. It further provides that "for purposes of deciding accomplice liability, a claim of supervisor created hostile work environment should be subject to the same analysis as a claim of co-worker harassment." *Id.* Thus, a supervisor is individually liable under a hostile work environment theory where the following is established:

> (1) that a hostile work environment existed;
>
> (2) that the [supervisor] acted affirmatively to aid, abet, incite, compel or command an employer not to take remedial action to the hostile work environment; and
>
> (3) that the employer engaged in employment-related discrimination by failing to take adequate remedial action.

*Id.* at 837.

In the instant case, it is clear that a hostile environment existed; furthermore, we have previously found that the evidence supports the conclusion that Superior failed to take adequate remedial action. Thus, the first and third elements listed above are satisfied. *Id.* As to the second element, we find that Twombley acted affirmatively in discouraging Superior from taking corrective action by telling his own supervisor, Mary Hogg, that he did not make the sexually explicit remark originally complained of by Steele. Twombley's denial that the conduct occurred was obviously designed to cover up his conduct and thus discourage Hogg and Superior from taking any action to remedy the hostile environment. *Id.* While this, by itself, does

19

not excuse Superior's lack of action, Twombley's denial is significant in the aiding and abetting analysis. Generally speaking, a denial of involvement in the offensive conduct tends to encourage an employer not "to take remedial action." *Id.* We do not see how it can be argued otherwise.

Having escaped discipline, Twombley proceeded to harass Steele with increasing frequency and severity, until he ultimately resigned. We therefore find that, under the facts of this case, Twombley can be held individually liable for hostile environment sexual harassment as an aider and abetter. *See* **Carr**, 955 S.W.2d at 835-38. Accordingly, we hold that the jury's verdict finding him liable on that theory is sustained by the evidence.

C.

We now turn to the second theory upon which the jury found the defendants liable - quid pro quo sexual harassment. Generally speaking, "[q]uid pro quo harassment occurs when a supervisor conditions employment benefits on 'sexual favors.'" *Id.* at 837; *Sanders*, 968 S.W.2d at 789. To prevail on a claim against an employer based on this theory, a plaintiff must show:

(1) that the employee was a member of a protected class;

(2) that the employee was subjected to unwelcome sexual harassment in the form of sexual advances or requests for sexual favors;

(3) that the harassment complained of was based on sex;

(4) that the employee's submission to the unwelcome advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's demands resulted in a tangible job detriment; and

(5) the existence of respondeat superior liability.

*Carr*, 955 S.W.2d at 837; *Sanders*, 968 S.W.2d at 789. As to the fifth element, the Supreme Court expressly stated in *Carr* that

[t]he employer is strictly liable for a supervisor's quid pro quo harassment under the doctrine of respondeat superior.... Under [an] alter ego theory of liability, the supervisor's acts within the scope of employment are imputed to the employer.

*Carr*, 955 S.W.2d at 837; *see also Sanders*, 968 S.W.2d at 789-90.

21

Superior insists that Steele failed to prove the fourth element of her quid pro quo claim.  We agree.  We acknowledge that there is some evidence that Twombley may have impliedly offered Steele job benefits in exchange for sexual favors; however, there is absolutely no evidence that Steele voluntarily submitted to his advances.  Thus, Steele was required to prove that her refusal to give in to Twombley resulted in some "tangible job detriment" to her.  *Carr*, 955 S.W.2d at 837; *Sanders*, 968 S.W.2d at 789.  As stated in *Burlington Industries, Inc. v. Ellerth*,

> [w]hen a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment....

*Id.*, 118 S.Ct. at 2265; *see also*, *Reinhold v. Commonwealth of Virginia*, 151 F.3d 172, 174-75 (4th Cir. 1998).  The United States Supreme Court defined a "tangible employment action" as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Burlington Industries*, 118 S.Ct. at 2268.

The record in the instant case indicates that Steele received positive job evaluations from Twombley.  She was not demoted or reassigned, nor did she receive any reduction in salary or benefits.  Her termination did not occur until approximately four months after Twombley's resignation, and,

22

following the dismissal of her retaliatory discharge claim, it does not appear that Steele has argued that her termination was related to the harassment. Thus, the record is devoid of any material evidence that an adverse "tangible employment action" resulted from Steele's refusal to submit to Twombley's advances. *Burlington Industries*, 118 S.Ct. at 2265; *Reinhold*, 151 F.3d at 175.[8] Accordingly, we find that the record does not contain material evidence to support the jury's finding that Superior is liable to Steele on the theory of quid pro sexual harassment. Rule 13(d), T.R.A.P.; *Carr*, 955 S.W.2d at 837.

Twombley, meanwhile, contends that he cannot be held individually liable for quid pro quo harassment under the THRA. He insists that the trial court should have granted his motion for directed verdict as to that claim. The Supreme Court in *Carr* specifically declined to address the question of individual supervisor liability for quid pro quo discrimination.[9] *Id.* at 837-38. Since we have already determined that this case does not present a viable claim of quid pro quo sexual harassment, we do not need to resolve this issue left open in *Carr*.

---

[8]In *Reinhold*, the plaintiff was allegedly subjected to various forms of harassment, including threats of suspension and the assignment of extra work when she refused her supervisor's advances; however, the Court noted that the plaintiff did not allege, nor did the evidence show, that she had suffered "a 'tangible employment action' sufficient to give rise to the automatic imputation of liability against [the defendants] for [the supervisor's] actions." *Reinhold*, 151 F.3d at 175.

[9]The Court did acknowledge that several state anti-discrimination statutes have been construed to provide for individual liability. *Carr*, 955 S.W.2d at 837-38 (citing *St. Peter v. Ampak-Division of Gatewood Products, Inc.*, 199 W.Va. 365, 484 S.E.2d 481 (1997); *Schram v. Albertson's, Inc.* 146 Or.App. 45, 934 P.2d 483 (1997); *Tyson v. CIGNA Corp.*, 918 F.Supp. 836 (D.N.J. 1996); *Conway v. City of Hartford*, 9 N.D.L.R. P 167, 1997 WL 78585 (Conn.Super.Ct. 1997); *Johnson v. Canadian Pacific Ltd.*, 522 N.W.2d 386 (Minn.Ct.App. 1994), *rev'd on other grounds*, 536 N.W.2d 319 (Minn. 1995); and *DuPuis v.Con-Test, Inc.*, 4 Mass. L. Rptr. 163, 1995 WL 809975 (Mass.Super.Ct. 1995)).

In summary, we hold that the record contains material evidence to support the jury's finding that Superior is liable under the THRA for hostile environment sexual harassment. The jury's verdict finding Superior liable on the theory of quid pro quo harassment, however, is not supported by the evidence. With regard to Twombley, we hold that the evidence supports a finding of liability as an aider and abetter on the theory of hostile environment harassment.

D.

As indicated earlier, the jury also found Twombley liable for "outrageous conduct and/or intentional infliction of emotional distress." We now examine the record to determine if there is material evidence to support the jury's finding as to that claim.

"Intentional infliction of emotional distress and outrageous conduct are not two separate torts, but are simply different names for the same cause of action." *Bain v. Wells*, 936 S.W.2d 618, 622 n.3 (Tenn. 1997). There are three elements to the claim:

> (1) the conduct complained of must be
> intentional or reckless;
>
> (2) the conduct must be so outrageous that it
> is not tolerated by civilized society; and
>
> (3) the conduct complained of must result in
> serious mental injury.

*Id.*

24

For reasons not entirely clear, Twombley does not specifically argue on appeal that the evidence is contrary to the jury's finding that he is liable for outrageous conduct. In any event -- taking the strongest legitimate view of all the evidence, *Poole*, 604 S.W.2d at 54 -- we find that the proof of Twombley's harassment and rape of Steele, and the emotional effects that his actions had upon her, clearly satisfies the elements of the cause of action. Accordingly, we hold that the record does contain material evidence to support the jury's verdict against Twombley on the theory of outrageous conduct/intentional infliction of emotional distress. Rule 13(d), T.R.A.P.

E.

The defendants further argue that the verdict must be set aside, insisting that the jury's award was "outside the bounds of reasonableness" and the product of passion, prejudice or caprice. The defendants also contend that the trial court erred in failing to further remit the award.

As we have previously stated, we must affirm the jury's verdict if the record contains material evidence to support it. Rule 13(d), T.R.A.P.; *Coffey v. Fayette Tubular Products*, 929 S.W.2d 326, 331 n.2 (Tenn. 1996). In our review, we are guided by a well-established principle:

> The amount of the verdict is primarily for
> the jury to determine, and next to the jury
> the most competent person to pass upon the

25

> matter is the judge who presided at the trial
> and heard the evidence.

*Smith v. Shelton*, 569 S.W.2d 421, 427 (Tenn. 1978) (citing *Reeves v. Catignani*, 7 S.W.2d 38, 39 (Tenn. 1928)).

We have heretofore determined that the record does contain material evidence to support the jury's findings that Superior and Twombley violated the THRA and that Twombley is liable to Steele for his outrageous conduct/intentional infliction of emotional distress upon the plaintiff. By the same token, our review of the record persuades us that there is material evidence to support the amount of compensatory damages awarded by the jury, as remitted by the trial court. The jury obviously accredited Steele's testimony to the effect that she had been harassed for an extended period and raped by Twombley. Although the award was high in relation to Steele's actual and anticipated medical expenses -- approximately $18,500 -- we cannot say that the pain, suffering and other damages caused by Twombley's actions did not justify an award of $850,000. Steele testified that, as a result of the harassment and rape, she has lost weight and suffers from headaches and flashbacks. She testified that she has not been able to focus well at work, and that she has also been affected spiritually. She stated that it is difficult for her to get up in front of a crowd of people, because she feels that everybody knows what happened to her. The record indicates that she has changed jobs several times since being terminated by Superior. Steele testified that, on one occasion, she passed up a good job opportunity because it potentially would have required her to work at times with a

26

company where Twombley was then employed. Steele began seeing a psychiatrist, Dr. Catherine Gyurik, in January, 1994. She was also treated by a therapist, Kathleen Reilly. In 1996, she began seeing Dr. Solovey, who observed that she was, among other things, frightened, anxious, tearful and distraught. At the time, Steele was also suffering from panic attacks. Dr. Solovey treated Steele for approximately nine months, but testified that, in his opinion, she needed an additional two years of treatment.

Accordingly, the defendants' argument that the amount of damages warranted a new trial or further remittitur is found to be without merit.

VI.

Twombley next argues that the trial court erred in giving the jury an inaccurate charge. In its instructions to the jury, the trial court stated that, "[a]s a supervisor with a right to control, in this case, Mr. Twombley, for the purposes of this charge, is to be considered as an employer as well."

We acknowledge that the Supreme Court in *Carr* held that the THRA's inclusion of "any person acting as an agent of an employer" in its definition of "employer" does not impose individual liability. *Carr*, 955 S.W.2d at 835. However, we have already held that the record supports a finding that Twombley is liable for hostile environment sexual harassment as an aider and abetter and for intentional infliction of emotional distress. While the quoted charge was erroneous, we do not find that it

27

more probably than not affected the jury's verdict; therefore, any error in the trial court's charge that Twombley was an "employer" was harmless.  Rule 36(b), T.R.A.P.

## VII.

Finally, Twombley contends that, because the THRA "does not apply to [him] as an individual supervisory employee," the trial court erred in awarding attorney's fees against him.  As we have previously explained, there is material evidence to support a finding that Twombley violated the THRA.  Accordingly, we find this issue to be without merit.

## VIII.

It results that the judgment of the trial court is affirmed.  Costs on appeal are assessed to the appellants.  This case is remanded to the trial court for enforcement of the trial court's judgment and for collection of costs assessed below, all pursuant to applicable law.

_____
Charles D. Susano, Jr., J.


CONCUR:


_____
Herschel P. Franks, J.


_____
William H. Inman, Sr.J.