IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
June 17, 2025 Session

## JAMES WHITFIELD LIVINGSTON v. LAUREN ELIZABETH LOGUE

**Appeal from the Juvenile Court for Davidson County**
**No. PT256270, 2020-886   Sheila Calloway, Judge**

———————————————————

### No. M2024-00878-COA-R3-JV

———————————————————

After an extended trial, the court adopted a permanent parenting plan for the child of unwed parents and determined the father's child support obligation. Mother takes issue with both decisions. Discerning no abuse of discretion, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT and JEFFREY USMAN, JJ., joined.

George D. Spanos and Stella K. Mallinak, Nashville, Tennessee, for the appellant, Lauren Elizabeth Logue.

James Collier, Nashville, Tennessee, for the appellee, James Whitfield Livingston.

## OPINION

### I.

#### A.

Lauren Elizabeth Logue ("Mother") and James Whitfield Livingston ("Father") are the parents of L.G.[1] Father petitioned to establish a permanent parenting plan when the child was about 15 months old. Mother filed a counterpetition for child support.

---

[1] Although Mother and Father were never married, Father signed a voluntary acknowledgement of paternity and was identified as the child's father on the birth certificate. *See* Tenn. Code Ann. § 24-7-113(a) (Supp. 2025).

At the outset, the parties agreed on a temporary parenting plan and child support amount. As reflected in the interim order, they agreed that Father would exercise parenting time every other weekend and alternate Wednesday nights. He was also obligated to pay $750 per month in temporary child support.

When L.G. was two and a half years old, a child developmental expert at Vanderbilt University Medical Center diagnosed her with autism spectrum disorder. Among other things, the clinical psychologist recommended applied behavior analysis ("ABA") services and intensive speech therapy. He provided the family with a list of recommended providers for these services. Even so, the parents had difficulty agreeing on a plan of care for the child or, as she aged, an appropriate school environment.

Despite the parents' differing opinions, the child received intensive speech therapy for five months and daily ABA therapy for nine months. The family also participated in virtual developmental therapy sessions until the child's third birthday. Mother and Father acknowledged at trial that the child improved immensely with therapy.

Around her third birthday, Mother had L.G. tested several times to determine an appropriate school environment. To her surprise, the educational assessments did not show a need for intensive interventions. Instead, the assessors recommended that the child attend a regular preschool to increase her social communication skills. Father was delighted. He refused to consent to additional therapy, insisting that the child attend preschool. Mother disagreed. In her opinion, the child needed continued therapy.

B.

Against this backdrop, the case went to trial. The court heard evidence on scattered dates over the course of a year.

It was undisputed that both parents loved L.G. She was a happy, active child who enjoyed spending time with both parents. Under the interim plan, Mother had been her primary caregiver. Father exercised his parenting time every other weekend and one night during the week.

As Mother explained, L.G.'s pediatrician recommended autism testing at the child's 18-month visit. Unlike Mother, Father was initially reluctant to accept this recommendation. But once he agreed, Mother scheduled a comprehensive developmental evaluation at Vanderbilt.

While they waited for the Vanderbilt assessment, Mother applied to the Tennessee Early Intervention System ("TEIS"), a free government program offering therapy and other services to families with developmentally delayed or disabled children under the age of three. Mother believed TEIS had the necessary experience and resources to help the family

2

navigate an unfamiliar process. After TEIS determined that the child was eligible, Mother shared this information with Father. But Father questioned whether TEIS was the best option because it only made referrals to a limited group of providers. So he did not consent to TEIS services. Mother claimed Father's opposition was unreasonable. The TEIS service coordinator maintained that the program had sufficient resources to meet the child's needs. But she admitted that it only made referrals to providers already under contract with TEIS.

Meanwhile, Vanderbilt completed the child's evaluation. After reading the recommendations, Father immediately contacted multiple service providers about treating the child. Knowing Mother would object, he did not disclose this activity until later. But he shared the news whenever he scheduled any assessments.

As expected, Mother objected to Father's unilateral activity and his chosen providers. She pointed out that his suggested providers were not on the Vanderbilt list. According to Father, he chose the speech therapy group because it offered in-person therapy, not virtual. In his opinion, in-person therapy would be more effective for a toddler. Father also claimed that none of the recommended center-based ABA service providers were available. So he suggested an in-home provider "to bridge the gap" until a center-based provider became available.

Despite her objections, Mother ultimately went along with Father's plan. L.G. participated in twice weekly speech therapy sessions until she completed the program around her third birthday. Mother conceded that speech therapy "turn[ed] out extremely well." L.G. "thrived," and her tantrums decreased as her communication skills improved. Mother also saw noticeable improvement after the first few months of in-home ABA therapy. So even though Father notified her about an opening at one of the recommended center-based providers, she opted to stay with the in-home service provider.

At Mother's request, TEIS provided services for the child until her third birthday. As the service coordinator explained, TEIS only needed the consent of one parent. Despite his earlier objections, Father participated in the virtual developmental therapy sessions.

Shortly before the child's third birthday, TEIS arranged with the local school system for a comprehensive assessment to determine the child's eligibility for special education services. The school evaluators determined that the child currently "perform[ed] within expectation for her age across all areas of development," so she did not meet the state criteria for an educational disability. Believing that the assessment was inaccurate, Mother requested additional testing. Two months later, the school evaluators assessed the child's current functioning level using a different test. But the previous determination did not change. Among other things, the evaluators suggested that the child would benefit from attending preschool or participating in group activities with other children.

Dissatisfied, Mother arranged for a third assessment by a board-certified behavior analyst. This evaluator also recommended that the child "attend a typical preschool to further social skills development due to the current lack of opportunities for social interactions with peers." According to the behavior analyst, the child displayed no challenging behaviors during the assessment even though the analyst repeatedly tried to elicit them.

For his part, Father believed that the child would thrive in a regular preschool environment. So he placed her on several waiting lists. When a spot became available, he notified Mother and arranged for a tour. Both parents were pleased. Mother conceded that she liked the curriculum and the teachers. She was relieved to learn that some of the teachers had experience with teaching autistic children. She even thought L.G. would like it. Still, Mother never completed her part of the application process. Mother blamed Father. She claimed he refused to discuss a transition plan or provide details about the child's daily schedule.

Mother acknowledged that the child had made "phenomenal progress" since her diagnosis and was "significantly better" by her third birthday. But she insisted the child still had "challenging days." Father claimed he had not witnessed the same behaviors. The in-home ABA therapy provider agreed with Mother. Shortly before trial, it proposed a behavior improvement plan. Father did not consent, so therapy ended.

Father asked the court to name him primary residential parent and substantially increase his parenting time. But Mother questioned his emotional and moral fitness to parent the child. She described his angry outbursts when they were still a couple and at one child exchange. Several witnesses also noted that Father raised his voice when angry and did not always treat the therapists with respect.

Mother wanted to make the temporary plan permanent. She attributed the child's improvement, at least in part, to the success of the temporary plan. In her view, maintaining a consistent schedule was critical for the child's ongoing development.

C.

The court determined that it was in the child's best interest to adopt a permanent parenting plan affording the parents equal parenting time. The court recognized that under the temporary plan, the child spent most of her time with Mother. Still, both parents had a close relationship with the child. Both parents were equally willing and able to care for the child and provide for her needs. Their work schedules were highly flexible. Yet when it came to the child's autism diagnosis, the court found that Mother had demonstrated an unwillingness to cooperate with Father. She tended to discount his suggestions. She also seemed unwilling to believe that the child could succeed in a regular preschool environment.

4

The court acknowledged that each parent had made unilateral decisions and scheduled appointments for the child without notifying the other. Because of their inability to work together in developing a plan of care for the child's autism, the court awarded Mother sole authority for nonemergency health care decisions. But it awarded Father sole authority for educational decisions based on the parents' communication difficulties and Mother's reluctance to approve appropriate school programs.

As for child support, the court ordered Father to pay $432 a month, the presumptive amount under the Tennessee Child Support Guidelines. It found Father's proof of income unreliable. But based on the evidence presented, it set his monthly income for child support purposes at $6,666.67. Upon finding Mother was voluntarily underemployed, the court set her income at an imputed monthly amount of $2,994.67.

**II.**

Mother presents a myriad of issues for our review. She asserts that the trial court erred in fashioning an equal parenting schedule and giving Father sole authority over the child's education. She disputes an evidentiary ruling at trial, which excluded evidence she contends was relevant to these issues. She also challenges the factual underpinnings of the court's child support decision. Finally, she seeks an award of attorney's fees, both at trial and on appeal.

We review a trial court's parenting and child support decisions for an abuse of discretion. *See Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013); *Richardson v. Spanos*, 189 S.W.3d 720, 725 (Tenn. Ct. App. 2005). We apply the same standard of review to evidentiary decisions. *White v. Beeks*, 469 S.W.3d 517, 527 (Tenn. 2015). When reviewing a discretionary decision, we must determine: "(1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the lower court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the lower court's decision was within the range of acceptable alternative dispositions." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). A trial court abuses its discretion only if it applies an incorrect legal standard; reaches an illogical conclusion; bases its decision on a clearly erroneous assessment of the evidence; or "employs reasoning that causes an injustice to the complaining party." *Konvalinka v. Chattanooga-Hamilton Cty. Hosp. Auth.*, 249 S.W.3d 346, 358 (Tenn. 2008).

**A.**

A trial court uses a familiar standard when fashioning a residential parenting schedule for the child of unmarried parents. *See* Tenn. Code Ann. § 36-2-311(a)(9), (10) (2021). Courts must fashion a residential schedule "consistent with the child's developmental level and the family's social and economic circumstances, which

5

encourage[s] each parent to maintain a loving, stable, and nurturing relationship with the child." *Id.* § 36-6-404(b) (2021). Unless certain limiting factors are dispositive, the court determines the schedule based on the child's best interest, relying on a non-exclusive list of factors found at Tennessee Code Annotated § 36-6-106(a). *Id.*

The determination of a child's best interest is a question of fact. *Armbrister*, 414 S.W.3d at 692; *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). So appellate courts must "presume that a trial court's factual findings on [best interest] are correct and not overturn them, unless the evidence preponderates against the trial court's findings." *Armbrister*, 414 S.W.3d at 693. In weighing the preponderance of the evidence, the trial court's findings of fact that are based on witness credibility are given great weight, and they will not be overturned "absent clear and convincing evidence to the contrary." *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007).

Mother contends that the trial court erroneously applied a presumption in favor of equal parenting. As reflected in the custody order, the court believed that it was generally in a child's best interest to maximize the participation of both parents. Tenn. Code Ann. 36-6-106(a) (2017).[2] Thus, "[b]oth parents should enjoy as close to equal time with the child as possible unless there are conditions to the contrary." Despite the inartful language, we conclude the court applied the correct law to this decision. The custody statute does not create a preference or presumption in favor of equal parenting. *Id.* § 36-6-101(a)(2)(A)(i) (Supp. 2020). Rather, it directs the court to maximize both parents' participation in the child's life "consistent with the [statutory best interest] factors . . . , the location of the residences of the parents, the child's need for stability and all other relevant factors." *Id.* § 36-6-106(a). Consistent with the statutory directive, the court expressly considered each of the applicable best interest factors in fashioning this parenting schedule.

Even so, Mother insists that it was in the child's best interest to maintain the residential schedule in the temporary plan because the child was thriving under that schedule. The temporary plan was in effect for almost four years. In Mother's view, it became the "new status quo." *Gorski v. Ragains*, No. 01A01-9710-GS-00597, 1999 WL 511451, at *6 (Tenn. Ct. App. July 21, 1999). Continuity is an important factor in the best interest analysis. Tenn. Code Ann. § 36-6-106(a)(10) (directing the court to consider "[t]he importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment"). But it does "not trump all other considerations." *Gaskill v. Gaskill*, 936 S.W.2d 626, 630 (Tenn. Ct. App. 1996). Here, the court recognized that continuity favored Mother. Still, based on its consideration of other relevant factors, the court determined that it was in the child's best interest to establish a different parenting schedule in the permanent plan.

---

[2] We apply the law in effect when Father filed his petition. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

6

Mother then directs our attention to the court's analysis of factors (2) and (7). Factor (2) considers each parent's ability and willingness to perform daily parenting responsibilities, including whether the parent is willing to encourage the child's relationship with the other parent. Tenn. Code Ann. § 36-6-106(a)(2). The court recognized that both parents were equally willing and able to care for the child. Even so, Mother had demonstrated an unwillingness to include Father in decisions with respect to the child's autism or to compromise with any of his suggestions. In the court's view, Mother only valued her own opinions about the appropriate plan of care, providers, and educational setting for the child. Mother contends that the proof at trial showed that Father was the uncooperative one. As she sees it, Father unreasonably refused to consent to TEIS services or to discuss the child's transition to preschool. The court apparently credited Father on this point. *See Richards v. Liberty Mut. Ins. Co.*, 70 S.W.3d 729, 733-34 (Tenn. 2002) (recognizing that "findings with respect to credibility and the weight of the evidence . . . may be inferred from the manner in which the trial court resolves conflicts in the testimony and decides the case"). We will not disturb the court's implicit credibility determination on this record. *See Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

Factor (7) looks at the child's emotional needs and developmental level. Tenn. Code Ann. § 36-6-106(a)(7). Here, the court focused on the multiple assessments Mother requested when the child aged out of TEIS. Mother recognized that the child had made tremendous progress by her third birthday. Three separate assessments recommended that the child attend a regular preschool. Yet Mother remained unwilling "to believe that her child could be successful in a normal school setting." Mother insists that the assessments were inadequate and the in-home provider supported her opinion. But we find ample support for the court's findings in this record.

Finally, Mother contends that the court erred in excluding relevant evidence of Father's moral fitness. We discern no abuse of discretion in that decision. *See White*, 469 S.W.3d at 527. In determining the child's best interest, the court may consider a parent's moral fitness "as it relates to their ability to parent the child." Tenn. Code Ann. § 36-6-106(a)(8). Mother tried to question Father about sexual harassment allegations against him. Evidence of sexual misconduct may be relevant to the comparative fitness analysis in a custody battle. *See Rayburn v. Rayburn*, No. 01A01-9710-CH-00548, 1998 WL 721088, at *3 (Tenn. Ct. App. Oct. 16, 1998) (holding that the court did not err in considering a spouse's sexual infidelity in its comparative fitness analysis because it spoke to the spouse's character). But the misconduct must have some relationship with parenting. *See Sutherland v. Sutherland*, 831 S.W.2d 283, 286 (Tenn. Ct. App. 1991) (recognizing that while "[s]exual infidelity or indiscretion does not ipso facto disqualify a parent from being awarded custody . . . . when the parent's sexual activities or indiscretion involve neglect of the minor child, such neglect may be considered in relation to the best interest of the minor child"). Mother's proof did not meet that standard. While we do not condone Father's behavior, it did not relate to his parenting ability.

We conclude that the court did not abuse its discretion in fashioning this parenting schedule. Determining the child's best interest is a "particularly fact-intensive process." *McEvoy v. Brewer*, No. M2001-02054-COA-R3-CV, 2003 WL 22794521, at *5 (Tenn. Ct. App. Nov. 25, 2003). Best interest decisions "often hinge on subtle factors, including the parents' demeanor and credibility during the . . . proceedings." *Gaskill*, 936 S.W.2d at 631. The court applied the correct law, the evidence does not preponderate against its factual findings, and its decision is within the range of acceptable alternative dispositions. *See Lee Med., Inc.*, 312 S.W.3d at 524; *Smallbone v. Smallbone*, No. M2020-01556-COA-R3-CV, 2022 WL 1405655, at *6 (Tenn. Ct. App. May 4, 2022).

B.

Mother also faults the court's decision to award Father sole decision-making authority over the child's education. When allocating decision-making authority in a permanent parenting plan, our courts consider several factors including each parent's history of decision making for the child and "[w]hether the parents have demonstrated the ability and desire to cooperate with one another in decision making regarding the child." Tenn. Code Ann. § 36-6-407(c)(2)-(3) (2021). Mother concedes that an award of sole decision-making authority for the child's health care and education was warranted here. *See Smallman v. Smallman*, 689 S.W.3d 845, 863 (Tenn. Ct. App. 2023) (noting that an award of sole decision-making authority is appropriate when parents are "unable to agree on important matters regarding their child[ ]'s medical and educational needs"). But she complains that the court should have awarded her primary authority in both areas because decisions about an autistic child's education and health care are inextricably linked.

While Mother makes a valid point as to the complications with separating educational and health care decisions for a child, who is autistic, we cannot say that the court's decision was an abuse of discretion on this record. *See Armbrister*, 414 S.W.3d at 693. The court gave Father the primary authority to make educational decisions based on the parents' communication difficulties and "Mother's reluctance to approve appropriate schooling programs." The evidence does not preponderate against these findings. Both parents, at times, fell short on communication. Despite the child's tremendous progress, Mother was unwilling to accept the results of three educational assessments. She failed to enroll the child in an appropriate preschool program even though she liked the teachers, the facility, and the curriculum. Nor did she pursue a comparable alternative. Mother's fear of a future problem is an insufficient reason to second-guess the court's decision. If the court's allocation proves unworkable, as Mother suggests, she may seek modification. *See Brunetz v. Brunetz*, 573 S.W.3d 173, 184 (Tenn. Ct. App. 2018) (concluding court had sufficient justification to modify decision-making authority when proof showed that parental conflict detrimentally affected the children).

8

C.

Mother argues that the court set Father's monthly gross income unreasonably low given the evidence at trial. Father was self-employed. Calculating child support "is much more difficult and much less precise when the obligor is self-employed." *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005). Father testified that his gross income from his landscaping business in 2022 was around $80,000. Mother submitted countervailing evidence. When seeking bankruptcy relief, Father asserted a much lower income figure. Upon review, the bankruptcy court found he had misrepresented his income and his explanation lacked credibility. Conversely, in mid-2020, Father represented on a rental application that his annual gross income was $120,000. Accounting records from Father's landscaping business for the first eight months of 2021 showed an accrued net income figure of over $182,000 without accounting for any fringe benefits. Father also commingled funds from his business payroll account and his personal checking account, making it difficult to discern his exact income.

Given the conflicting evidence, the court found that "Father's purported income [wa]s unreliable." Based on the evidence presented, the court determined that his "salary [wa]s probably somewhere between $80,000 and $120,000.00 annually." Mother's proof cast doubt on the reliability of Father's testimony, but it does not support a different income finding with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005).

D.

Mother complains that the trial court failed to award her attorney's fees at trial. Tennessee courts follow the "American rule" on attorney's fees. *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009). Under the American rule, "litigants must pay their own attorney's fees unless there is a statute or contractual provision providing otherwise." *Taylor*, 158 S.W.3d at 359. Here, Mother bases her request on Tennessee Code Annotated § 36-6-236, a provision of the Uniform Child Custody Jurisdiction and Enforcement Act. *See* Tenn. Code Ann. §§ 36-6-201 to -243 (2021 & Supp. 2025). The UCCJEA establishes standards for enforcement and modification of child custody determinations in interstate custody disputes. *Staats v. McKinnon*, 206 S.W.3d 532, 544 (Tenn. Ct. App. 2006). The cited statute does not authorize an award of attorney's fees in "a purely intrastate custody dispute" like this one. *Keyt v. Keyt*, 244 S.W.3d 321, 333 (Tenn. 2007).

Mother also seeks an award of attorney's fees incurred on appeal. She does not specify the statutory basis for her request. But we have discretion to award fees on appeal to the prevailing party in a custody dispute or a proceeding to enforce child support under Tennessee Code Annotated § 36-5-103(c). *See Colley v. Colley*, 715 S.W.3d 293, 315 (Tenn. 2025). In exercising our discretion, we consider the purposes behind the statute and

the circumstances of the appeal.  *Id.* at 316.  Considering these factors, we decline to award attorney's fees to Mother.

**III.**

The trial court did not abuse its discretion in fashioning the permanent parenting plan or determining child support.  So we affirm.


_s/ W. Neal McBrayer_
W. NEAL MCBRAYER, JUDGE