IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 1, 2017

IN THE MATTER OF IAN B. ET AL.

Appeal from the Chancery Court for Rutherford County
No. 12CV-582        Howard W. Wilson, Chancellor

_____

No. M2016-02504-COA-R3-PT

_____

This is Father's second appeal of the termination of his parental rights to the two children he had with his former wife ("Mother"). Father and Mother separated in 2008 when she moved from Alaska to Tennessee with the children, and they were granted a divorce in 2009. Father has not seen nor spoken with the children since 2008, and has not provided any financial support since November 2009. The petition to terminate Father's parental rights was filed by Mother and her husband in 2012. In Father's first appeal, we remanded the case in order to obtain a sufficient record for this court to review on appeal. *In re Ian B.,* No. M2015-01079-COA-R3-PT, 2016 WL 2865875 (Tenn. Ct. App. May 11, 2016). On remand, the trial court found that the petitioners had proven grounds of abandonment for failure to visit and support and that termination of Father's parental rights was in the best interest of the children. This appeal followed. Having determined that the record in this second appeal is sufficient for this court to conduct a proper review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which THOMAS R. FRIERSON II and BRANDON O. GIBSON, JJ., joined.

Daniel Lyn Graves II, Murfreesboro, Tennessee, for the appellant, Kenny B.[1]

Steven C. Girksy, Clarksville, Tennessee, for the appellees, Corey D. and Amy D.

_____

[1] This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

# OPINION

At issue in this case are the parental rights of Kenny B. ("Father") with regard to two of his children, Ian B. and Isaac B. (collectively "the Children"). In April 2005, Amy D. ("Mother") and Father married. Their marital relationship, however, was short-lived and unstable.[2] Mother and Father originally resided in Arizona but moved when Father was arrested and extradited to Alaska on robbery charges. Mother, while pregnant with their youngest child, left Father in 2006 to travel to Florida but returned to Alaska in 2007. In November 2008, Mother again left Father, this time permanently. At the time of the move, Ian was one year old, and Isaac was just shy of three years old. Mother moved with the Children to Murfreesboro, Tennessee, where they remained until 2014 when they moved to Smyrna, Tennessee with Mother's current husband, Corey D.

In December 2008, Father filed a divorce action in Juneau, Alaska. As a part of the divorce petition, Father signed and attached an affidavit, which listed the address of Mother in Murfreesboro.[3]

In February 2009, Mother filed an ex parte order of protection in Tennessee against Father alleging Father made threatening phone calls and that he instructed individuals in Tennessee to threaten Mother. The hearing was held on February 17, 2009. Father did not appear. It is unclear, however, if Father ever received notice of this hearing. Along with the ex parte order, Mother filed a petition for an order of protection. Father did not file an answer to the petition or appear at the hearing on the order of protection, which was heard in Tennessee in April 2009.[4] In the resulting order, the trial court required Father to complete anger management classes. Father has yet to attend or even attempt to attend and complete these classes.

In the interim, in March 2009, Father was attacked and severely beaten outside of his work place in Alaska. He was taken by helicopter to the hospital where he spent the next four months recovering. Father sustained a mental impairment that caused a multitude of physical and mental problems. Specifically, Father testified that he was

---

[2] In Mother and Father's 2009 Property Settlement, Child Custody, and Support Agreement, the Alaska trial court found that Father had previously abused Mother.

[3] This fact is important for the analysis of this case because at trial Father argued that he did not know where Mother and Children were located.

[4] This stems from the date the order was entered (April 21, 2009) and that the Petitioners, Mother and Corey D., stated in their brief that the hearing was held on that date. However, no testimony in the trial court directly addressed the hearing date. As explained in the next paragraph, Father was in the hospital in both February and April and therefore could not have appeared for either hearing.

diagnosed with agoraphobia,[5] obsessive compulsive disorder, and post-traumatic stress syndrome.

Mother and Father's divorce was finalized in June 2009, with Mother receiving full custody of the Children. Father was ordered to attend an intervention for batterers course due to the Alaska court's finding that Father had abused Mother during the marriage. The Alaska court further ordered that any visitation was to take place only after completion of this course, that visitation was in the sole discretion of Mother, and that only supervised visitation was allowed without a court order. As with the ordered anger management courses, Father has yet to attempt to attend and complete this intervention program. The Alaska court also ordered Father to pay child support. He made sporadic support payments from June 2007 through November 2009, but he has not made any support payments since November 2009.

After Father was released from the Alaska hospital, he moved to Arizona to live with his father, who arranged the move. Father received extensive rehabilitation while in Arizona where he was under the care of a psychiatrist, a physical therapist, and a home-care nurse. During his rehabilitation, Father applied for and received Supplemental Security Income ("SSI"). Father lived in Arizona until January 2010 when he moved to Arkansas to live with his sister.

In 2011, both Mother and Father found new romantic partners. Mother subsequently married Corey D. ("Stepfather"), with whom she and the Children currently live in Smyrna, Tennessee. Father, after dating Kelly S. ("Kelly") for a period of time while still residing with his sister, moved out of his sister's home to reside with Kelly and two of his children from a previous relationship.[6] Father and Kelly currently reside in a home in Arkansas that Kelly purchased from the estate of Father's grandmother for $80,000. Kelly is the sole owner of the home.

On March 12, 2012, Mother and Stepfather sent a letter to Father requesting his consent to terminate his parental rights and allow Stepfather to adopt the Children. Father refused to consent. On April 12, 2012, Mother and Stepfather filed a petition to terminate Father's parental rights on the ground of abandonment and for Stepfather to adopt the Children.

The testimony at trial revealed that Father's physical and mental condition had dramatically improved by 2011. Father was able to attend Pulaski Tech in Little Rock,

---

[5] "The word agoraphobia is derived from Greek words literally meaning 'fear of the marketplace.' The term is used to describe an irrational and often disabling fear of being out in public." *See* Agoraphobia, Gale Encyclopedia of Medicine, 1919600048 (4th Ed. 2012).

[6] Father apparently has six children: the two children at issue in this case, two sons from another relationship, one daughter from a different relationship, and one other son.

Arkansas and graduate with an associate's degree in hydrographics;[7] however, Father did not obtain a job after graduation. In fact, Father turned down job offers because he and Kelly had plans to open a business in the near future in which Kelly would own the business and employ Father.[8] Father also testified that even though he was given job offers, he was not ready to start working in the auto body painting profession.[9]

As for visiting the Children, Father and Kelly testified at trial that they tried to initiate contact with Mother through Facebook, but they could not make contact because Mother "blocked" each party.[10] Father also testified that his two sons from a prior marriage attempted to contact Mother via Facebook but again were "blocked." Father also testified that he had a couple of phone conversations with Mother in 2009. Mother's testimony conflicts with these statements. Mother testified that the only attempted contact from Father was a Facebook friend request in 2014.

Following the trial, the court issued an order on March 24, 2015, terminating Father's parental rights and granting Stepfather's adoption of the Children. Father timely appealed that decision. In his first appeal, we vacated the judgment of the trial court and remanded the case due to the lack of sufficient record to afford this court the opportunity to conduct a meaningful review. *In re Ian B*., 2016 WL 2865875. In that opinion, we noted that the trial court could require "the preparation of a full transcript or so much of the transcript as is germane to the issues Father raises on appeal." *Id*. at *2. We also stated, "[o]nce the transcript is prepared, the chancery court may enter a new order and memorandum opinion on the petition to terminate Father's parental rights and for the Stepfather to adopt." *Id*. A transcript of those proceedings was prepared and submitted to the trial court on September 16, 2016, which the trial court certified in accordance with Tenn. R. App. P. 24. Thereafter, the trial court issued a Memorandum and Order in which it found that Father willfully abandoned the Children and that termination was in the best

---

[7] Hydrographics is a type of auto body painting.

[8] Father testified that Kelly S. was pre-approved for a $100,000 loan which will be used to open a liquor store. The new business idea was originally that Kelly S. would open a hydrographics shop but the county in which the couple lives recently became wet. Therefore, the couple thinks a liquor store would be more lucrative.

[9] Portion of Father's testimony:

> Q: "Why haven't you gotten a job at an auto repair place?"
> A: "Because I'm not ready."
> Q: "Why aren't you ready?"
> A: "'Cause I just graduated."

[10] Father testified that when someone "blocks" another on Facebook, the party blocked cannot see anything on the other person's profile, nor can they interact with the person who blocked them.

interests of the Children. The trial court also granted Mother and Stepfather's adoption petition.

Father failed to file his notice of appeal within 30 days on the entry of that order as required by Tenn. R. App. P. Rule 4. Nevertheless, on November 3, 2016, Father filed a Motion for Rule 60.02 Relief in which he set forth reasons why he was unable to file a timely notice of appeal. Namely, Father's attorney stated the he (the attorney) mistakenly took the court's final order as a memorandum due to the fact the court previously issued a memorandum and then a final order. Further, the attorney was out of town and then had to fulfill his duties with regard to his military commitment. The trial court agreed with Father that this was excusable and granted the Rule 60.02 motion which incorporated the September 16, 2016 order. Father filed his notice of appeal within 30 days of the entry of that order.

## ISSUES

1. Whether the trial court abused its discretion in granting Father's Rule 60.02 motion.
2. Whether the trial court properly determined that grounds existed to terminate Father's parental rights.
3. Whether the trial court properly determined that the termination of Father's parental rights was in the best interests of the Children.

## ANALYSIS

## I. RULE 60.02 MOTION

Mother argues that the trial court abused its discretion in granting Father's Rule 60.02 motion. Specifically, Mother asserts it was an abuse of discretion to grant the Rule 60.02 motion because Father did not file an affidavit in support of his request for relief and Father failed to put forth an affirmative showing of mistake, inadvertence, surprise, or excusable neglect. Tenn. R. Civ. P. Rule 60.02 provides:

On motion and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment, order or proceeding for the following reasons: (1) mistake, inadvertence, surprise or excusable neglect; (2) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (3) the judgment is void; (4) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that a judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment.

Tenn. R. Civ. P. 60.02. While not expressly stated in the rules, it is "universally recognized that, as a condition to obtaining relief, the defendant, in addition to showing that his default was brought about by mistake, inadvertence or excusable neglect, must also demonstrate that he has a meritorious defense to the plaintiff's claim . . . ." *Patterson v. Rockwell Intern.*, 665 S.W.2d 96, 100 (Tenn. 1984). When determining whether neglect is excusable the court is to consider the equities of the case, including: the (1) danger of unfair prejudice, (2) the length of delay and its potential impact on proceedings, (3) the reason why the filing was late and whether that reason or reasons were within the filer's reasonable control, and (4) the filer's good or bad faith. *See Ferguson v. Brown*, 291 S.W.3d 381, 388 (Tenn. Ct. App. 2009).

In analyzing the equities of the case, the trial court found the danger of unfair prejudice was minimal, the length of delay due to an extension was small compared to the overall period, Father's counsel's mistake was reasonable, and the equities weighed in favor of Father. The main area of contention between the parties revolved around Father's counsel ("Counsel"). The trial court stated that Counsel's mistake in not filing a timely appeal was excusable for a number of reasons:

> . . . .
>
> 3. Counsel for the Respondent represents to the Court that his mistaken disregard for the Court's September 23, 2016, [order] was on several factors. One, the Court's Memorandum Opinion of March 24, 2015 did not contain an Order effectuating the ruling of the Court. That document requested Counsel for Petitioners to prepare such Order. Because the Court essentially reissued its previous Memorandum Opinion on September 23, 2016 (save for the addition of an Order catalyzing the ruling), Counsel was under the mistaken belief that the document once again instructed Petitioner's Counsel to prepare the final Order. The Court believes this was a justifiable mistake; however, this alone does not convince the Court that 60.02 relief should be granted.
>
> 4. After the entry of the Memorandum and Order (and its issuance on September 27, 2016), Counsel for the Respondent received the document on the same date he was scheduled to leave the country. Counsel was abroad between September 28, 2016 and October 10, 2016. When he returned, Counsel was once again taken from his work between October 21, 2016 and October 30, 2016, as he was under order to present himself for military service.
>
> 5. Matters regarding counsel's mistaken identification of the Memorandum and Order are further complicated by the slow communications between the

Respondent and his attorney. Because of the slow communications, when Respondent's counsel received the Court's Memorandum and Order of September 23, 2016, he contacted the Respondent only to find himself leaving a message for Respondent that would need to be returned.

A grant or denial of a Rule 60.02 motion is within the sound discretion of the trial judge. *Underwood v. Zurich Ins. Co.*, 854 S.W.2d 94, 97 (Tenn. 1993). Discretionary decisions require "a conscientious judgment, consistent with the facts, that takes into account the applicable law." *White v. Beeks*, 469 S.W.3d 517, 527 (Tenn. 2015) (citing *Lee Med. Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010)). Discretionary decisions are reviewed pursuant to the "abuse of discretion" standard of review. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). The abuse of discretion standard does not permit reviewing courts to substitute their discretion for the trial court. *Id*. Nevertheless, the abuse of discretion standard of review does not immunize a lower court's decision from any meaningful appellate scrutiny. *Id*.

> Discretionary decisions must take the applicable law and the relevant facts into account. An abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision. A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.

> [R]eviewing courts should review a [trial] court's discretionary decision to determine (1) whether the factual basis for the decision is properly supported by evidence in the record, (2) whether the [trial] court properly identified and applied the most appropriate legal principles applicable to the decision, and (3) whether the [trial] court's decision was within the range of acceptable alternative dispositions. When called upon to review a lower court's discretionary decision, the reviewing court should review the underlying factual findings using the preponderance of the evidence standard contained in Tenn. R. App. P. 13(d) and should review the [trial] court's legal determinations de novo without any presumption of correctness.

*Id*. at 524-25 (internal citations omitted).

Therefore, we review the trial court's decision to grant Father's Rule 60.02 motion to determine whether there is a factual basis for the decision in the record, whether the court properly identified and applied the applicable legal principles, and whether the decision is within the range of acceptable alternative dispositions. *Id*. at 524.

Here, there clearly is a factual basis for the trial court's decision. Furthermore, the trial court properly applied the applicable legal principles, and the court's decision to grant the motion was within the range of acceptable alternative dispositions. Specifically, the court relied on the justifiable excuse in this case and Counsel's military service to this country which caused delay in his understanding that he actually had received the trial court's order. Also, Mother's reliance on Counsel's failure to attach an affidavit does not provide grounds for reversal of the trial court's decision. Therefore, we find no abuse of discretion.

## II. TERMINATION OF PARENTAL RIGHTS

Parents have a fundamental right to the care, custody, and control of their children under both the United States and Tennessee Constitutions. *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002) (citing *Stanley v. Illinois*, 405 U.S. 645, 651-52 (1972)). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. 2005). While this right is superior to the claims of other persons and the government, it is not absolute; the state may terminate a person's parental rights under certain circumstances. *In re Heaven L.F.*, 311 S.W.3d 435, 438 (Tenn. Ct. App. 2010); *Santosky v. Kramer*, 455 U.S. 745, 747-48 (1982).

Under Tennessee law, "[t]o terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). We review findings of fact made by the trial court de novo upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." *In re F.R.R.*, 193 S.W.3d at 530 (quoting Tenn. R. App. P. 13(d)).

However, because of the heightened burden of proof in termination proceedings, this court must make its own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010). The trial court's ruling regarding whether the evidence sufficiently supported termination is a conclusion of law, which we review de novo with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524.

## A. ABANDONMENT

The trial court found that the petitioners proved two grounds of abandonment of the Children under Tenn. Code Ann. § 36-1-113(g)(1). More specifically, the court found that Father had abandoned the Children "as no support or care of any type or sort has been rendered or paid for the benefit of the minor children by [Father] within the past four (4) months as provided in Tennessee Code Annotated § 36-1-102(1)(A) and § 36-1-113 (g)(1). There has been no support and only 'token' visitation as provided for in Tennessee Code Annotated § 36-1-102(1)(A) and § 36-1-113(g)(9)(A)(iii)." We agree.

Under Tennessee law, for purposes of terminating a parent's parental rights, "abandonment" is defined as:

> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child

Tenn. Code Ann. § 36-1-102 (1)(A)(i). "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re Audrey S.*, 182 S.W.3d. at 864.

In this case, Father argues that the trial court erred in terminating his parental rights on the grounds of abandonment. Father's arguments all stem from his March 2009 attack and the injuries suffered from that attack. Father states that he could not have acted willfully because (1) he was unable to provide for his Children, (2) he did not know the Children's location, and (3) Mother never provided Father with where the Children were located and Mother thwarted Father's attempts to contact the Children. Mother, however, argues the trial court did not err because the undisputed facts dismiss Father's first two arguments. Mother did not address Father's third argument in her brief.

### 1. Willful Failure to Support

It is undisputed that Father provided no support for the benefit of the Children since November 2009. Thus, the issue is whether his failure to support the Children was willful.

Although an education is a great investment, here, Father's investment in himself did not excuse the obligation to support the Children. While it is true that Father is

disabled and has limited means, Father had the ability to obtain work within the relevant four (4) month period but simply chose not to.[11] This is a prime example of willful action.[12]

Father was fully aware of his duty to support his children as he was ordered by the Alaska court to pay support which he paid, albeit sporadically, from 2007 to November 2009. Although Father was temporarily unable to work, for which he received SSI, it is undisputed that he had made a remarkable recovery by 2011. In fact, he had recovered to the extent he was able to attend college and earn an associate's degree. Despite his degree and his mental and physical recuperation, Father admitted that he declined employment opportunities because he wanted to wait for his girlfriend, Kelly, to open a business where he planned to work. The problem with his deferred plan of employment is that he was under an affirmative duty to financially support the Children yet he elected to avoid employment that would have enabled him to do so during the period of time relevant to this issue.

Therefore, we affirm the trial court's finding that the petitioners proved by clear and convincing evidence that Father willfully failed to support the Children.

2. Willful Failure to Visit

In 2009, and possibly as late as 2010, while Father was recuperating from his injuries, Father may not have had the ability to travel to Tennessee to visit the Children. This limitation, however, did not restrict his ability to send them letters or to speak with them by phone. Nevertheless, he did neither during this period. Moreover, he recuperated sufficiently by 2011 to travel to Tennessee to visit the Children yet he made no attempts to do so. Furthermore, his excuses, that he did not know where the Children were or that Mother prevented visitation, are unpersuasive. To the contrary, Father's recovery, as evidenced by his ability to care for his other children as well as his ability to attend college and obtain an associate's degree, clearly and convincingly prove that he had the ability to visit the Children prior to and during the relevant four-month period.

Father argues that Mother thwarted his attempts to contact the Children and that Mother did not provide "a way or notice for [Father] to know where his children were." Father, his girlfriend Kelly, and his sister testified that each of them tried to contact Mother through Facebook, but Mother denied these statements. Father even testified that

---

[11] "The statutory definition of 'abandonment' requires us to focus on the 'period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights[.]'" *In re Jaylah W.*, 486 S.W.3d 537, 547–48 (Tenn. Ct. App. 2015) (citing Tenn. Code Ann. § 36-1-102(1)(A)(i)). Therefore, the relevant time period in this case is December 2011 – April 2012.

[12] "[W]illful conduct involves acts or failures to act that are intentional or voluntary rather than accidental or inadvertent." *In Re S.M.*, 149 S.W.3d 632, 642 (Tenn. Ct. App. 2004).

he spoke with Mother in 2009 about talking to the Children. Mother also denied this statement.

While Father contends he did not know where the Children were, in December 2008 Father signed an affidavit in his petition for divorce in which he listed the address of Mother and the Children in Murfreesboro, Tennessee, and Mother and Children remained at this address from December 2008 to 2014. Nevertheless, Father claimed he was confused about the location of the Children and that he no longer had the affidavit because his father moved "what he could" of Father's from Alaska to Arizona which, apparently, did not include the affidavit. We find this excuse wholly inadequate because Father could have contacted the Alaska court or his previous attorney to obtain the information he claimed Mother kept from him. Moreover, when cross-examined about whether he had the ability to obtain the affidavit from his lawyer, Father admitted that, "[n]othing would've stopped me. Yes, I could've got the address." Therefore, Father's claim that he did not have the Children's address or that Mother somehow thwarted his attempts to visit or communicate with the Children is without merit.

As for the allegations that Mother interfered with or prevented visitation, we find this without merit because Father always had the opportunity to seek the assistance of the court, but he never did. Although this court has refused to find willful abandonment where a parent has been thwarted in visitation efforts, the facts of this case do not support the conclusion that Father's action should be excused. *See In re Adoption of A.M.H.*, 215 S.W.3d 793, 810-11 (Tenn. 2007) (holding parents did not willfully abandon their child even though the parents had not seen the child in four months due, in part, to the parents' actions in seeking judicial assistance). Therefore, Father's claim that he did not have the Children's address or that Mother somehow thwarted his attempts to visit the Children is meritless.

The evidence in the record also proves that Father's failure to visit the Children during the relevant four-month period was self-inflicted and not due to the actions of Mother. This conclusion is based on the following undisputed facts:

1. Father never complied with the 2009 Alaska Property Settlement, Child Custody, and Support Agreement which required Father to complete intervention for batterers before he could seek visitation with the Children at Mother's sole discretion.
2. Father never completed anger management which was ordered by the Tennessee court as part of Mother's Order of Protection.[13]
3. The trial court's finding that Father never sent any type of gift, card, etc. to the Children.

---

[13] While it is clear Father was unable to attend this hearing because he was hospitalized, he never challenged the ruling when he had the ability to do so.

4. Father lived approximately six (6) hours away from Murfreesboro, yet he never attempted to see his children. This is true even though Father was able to move from Alaska to Arizona and Arizona to Arkansas.
5. Father never attempted to seek judicial assistance in visiting his children.

Therefore, we affirm the trial court's finding that Father willfully failed to visit during the requisite period.

## B. BEST INTERESTS OF THE CHILDREN

To terminate parental rights, a court must determine not only that the evidence provides clear and convincing proof that grounds for termination exist, but also that termination is in the child's best interests. Tenn. Code Ann. § 36-1-113(c)(1)-(2). If one of the statutory grounds for termination is proven by clear and convincing evidence, a parent's rights may be terminated if termination is in the best interests of the child. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

The legislature has identified nine statutory factors for the court to consider in conducting a best-interests analysis, *see* Tenn. Code Ann. § 36-1-113(i); however, this list is not exhaustive, and the court need not find the existence of every factor before it may conclude that terminating an individual's parental rights is in the best interests of a child. *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). Instead, "[t]he relevancy and weight to be given each factor depends on the unique facts of each case." *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005). Further, in considering a petition to terminate parental rights, the court is called to make a determination of the child's best interests from the perspective of the child rather than the parent. *In re Heaven L.F.*, 311 S.W.3d at 441. The factors listed under Tennessee Code Annotated § 36-1-113(i) are as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances or controlled substances analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In this case, the trial court analyzed each of the nine listed factors and concluded that termination of Father's parental rights was in the best interests of the Children. We agree.

First, the trial court found that even though Father's condition had dramatically improved, it could not find the increase in stability in Father's environment to be in the best interests of the Children. The trial court relied on the fact that the Children are currently very comfortable and that the home of Mother and Stepfather is very stable. The evidence clearly supports this finding; thus, this factor weighs in favor of terminating Father's rights.

Next, the trial court found that Father has not taken the necessary steps to show a lasting adjustment in his life. To support this conclusion, the court relied on the facts that Father failed to complete the anger management classes or the intervention program ordered by the Tennessee and Alaska courts, respectively, over five years ago. The evidence also clearly supports this finding. Therefore, this factor also weights in favor of terminating Father's rights.

In addressing the third factor, the trial court found it weighed heavily in favor of terminating Father's rights. The court stated, "[i]n fact, [Father] has had no visitation and

has maintained no contact even though he certainly had the opportunity to." Although Father suffered a disabling attack in March 2009, he made a significant recovery as early as 2011; however, his only attempts to contact the Children were through occasional Facebook messages and a couple of phone calls to Mother in 2009.

As for the fourth factor, the trial court found that it also weighed in favor of terminating Father's rights. We agree. As the trial court stated, "Not only has [Father] made no contact with the children in nearly six years, he has failed to even attempt to establish any meaningful relationship with them." This is supported by testimony that the only attempts Father has made to contact the Children were through occasional Facebook messages and phone calls to Mother in 2009.

The trial court found, and we agree, that a change of caretakers and physical environment would likely have a negative effect on the children. The Children have resided with Mother and Stepfather since 2011. The trial court found that the Children were happy and well-adjusted to their current living arrangement. Further, "[b]ecause they are so young when they last had any contact with their father, they hardly know him, and they certainly do not know his other children or his current girlfriend." The evidence in the record clearly supports this finding; therefore, this factor weighs in favor of terminating of Father's rights.

We also agree with the trial court that the sixth factor weighs in favor of terminating Father's rights. Father's previous physical abuse towards Mother supports this conclusion. First, the Alaska court found Father had physically abused Mother and ordered him to complete an intervention for batterers, which has yet to be completed. Second, the Tennessee court ordered Father to complete anger management courses as a part of Mother's order of protection; however, Father has not completed these courses either. Therefore, the sixth factor weighs in favor of terminating Father's rights.

The trial court found the seventh and eighth factors to essentially be neutral. However, the court stated that "any positive impact that [the seventh] factor has on the Court's analysis of the children's best interest is negated by other listed factors weighing against the Father and his current home life." In relation to the eighth factor, the court simply found Father's previous psychological and emotional issues no longer appeared evident. The evidence clearly supports these conclusions and therefore, these factors do not move the scales in either direction for or against termination of Father's parental rights.[14]

---

[14] The court need not find the existence of every factor before it may conclude that terminating an individual's parental rights is in the best interests of a child. *See* In re M.A.R., 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005).

The ninth, and final, factor clearly weighs in favor of terminating Father's rights. We agree with the trial court's analysis:

> It is unmistakably clear from the record that the Father has failed miserably at support[sic] his children that are the subject of this proceeding. Although his income is meager, he lives with his girlfriend and has few expenses. The Court finds that Father was certainly capable of working during the relevant period, having earned an associate's degree. Instead, he has turned down a number of jobs for the hope of starting his own business. The Court understands this hope to be little more than a pipe dream depriving his children of necessary support. For these reasons, the ninth factor is clearly against the Father.

Thus, the ninth factor weighs in favor of terminating Father's rights; and therefore, we affirm the trial court's ruling that termination of Father's parental rights is in the Children's best interests.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against the appellant, Kenny B.

_____
FRANK G. CLEMENT JR., P.J., M.S.